Barbara A. GHETA, George Ehman, Victoria Guadagna, and Hugh McElhon, Plaintiffs,

v.

NASSAU COUNTY COMMUNITY COL-LEGE; Dr. Sean Fanelli, in His Capacity as President of Nassau County Community College; Board of Trustees of Nassau Community College; Rosalyn Udow, in Her Capacity as Chairman of the Board of Trustees of Nassau County Community College; and Dr. Joseph Dondero and Professor Valerie Pinhas, in Their Capacities as Employees of Nassau County Community College, Defendants.

No. 95 CV 1849.

United States District Court, E.D. New York.

Jan. 21, 1999.

Christopher A. Ferrara, American Catholic Lawyers Assoc., Inc., Fairfield, NJ, Joseph P. Infranco, Migliore & Infranco, Commack, NY, for plaintiffs.

Gregg M. Mashberg, Elise A. Yablonski, Proskauer Rose LLP, New York City, for defendants.

## *OPINION AND ORDER*

GERSHON, District Judge.

Plaintiffs are three Nassau County residents and one non-resident. Defendants are Nassau County Community College (NCC); Dr. Sean Fanelli, in his capacity as NCC President; the Board of Trustees of NCC; Dr. Roslyn Udow, in her capacity as Chairman of the Board of Trustees; and two NCC professors in their capacities as NCC employees. Plaintiffs filed this action in May 1995, challenging the constitutionality of a NCC course entitled "Family Living and Human Sexuality," Physical Education # 251 (PED 251). By stipulation dated October 18, 1995, plaintiffs discontinued their claims under 42 U.S.C. § 1983, 18 U.S.C. § 2252, Title X of the Public Health Services Act, 42 U.S.C. § 201 et seq. and N.Y. Penal Law §§ 130.00, 260.10 and 260.20. Plaintiffs' claim under N.Y.Educ.Law § 607 and their free exercise of religion claims under the New York State Constitution, the First Amendment to the United States Constitution and 42 U.S.C. § 2000bb, the Religious Freedom Restoration Act, were dismissed by the Honorable Arthur D. Spatt, District Judge, in April 1996. *See Mincone v. Nassau County Community College*, 923 F.Supp. 398 (E.D.N.Y.1996). Plaintiffs' sole remaining claim seeks a declaration that PED 251 violates the Establishment Clause on the ground that it disparages and attempts to destroy the adherence of students to "traditional Jewish and Christian, and particularly Catholic," religious tenets. Specifically, plaintiffs argue that PED 251 proselytizes against the Judeo–Christian sexual ethic and advocates an anti-religious sexual ethic to replace it and that it employs various exercises, self-evaluations and audiovisual materials which are designed to coerce and manipulate a change in students' religious beliefs.

Defendants have moved for summary judgment. They argue that plaintiffs lack standing and have failed to raise any material factual issues suggesting that PED 251 advances or disparages religion. Defendants further argue that the relief sought by plaintiffs would itself constitute a violation of the Establishment Clause because any proscription of activities offensive to plaintiffs' religious beliefs would give rise to an improper preference to plaintiffs' religions.

## FACTS

The following facts are undisputed:

NCC is an accredited community college in Garden City, New York and part of the State University of New York system. The average age of NCC students is over twenty-five. NCC has offered PED 251 through its Department of Health, Physical Education and Recreation since the 1960s. PED 251 is one of five elective courses that full-time students may take to fulfill NCC's two-credit health requirement. PED 251 is extremely popular among students. As many as thirty sections of approximately forty students are offered each semester, with another eighteen sections offered during the summer.

Each section of students is required to read at least one of two textbooks on human sexuality, *Our Sexuality,* Robert Crooks and Karla Baur, (Brooks/Cole Publishing Co., 6th ed.1996) and *Sexuality Today: The Human Perspective,* Gary F. Kelly, (Brown & Benchmark Publishers, 5th ed.1996). Both texts are used by colleges and universities throughout New York. Students also are required to read handouts, complete homework assignments and, on occasion, to watch films during class. The materials address a wide variety of topics related to human sexuality, including the anatomy and functioning of the male and female reproductive systems, childbirth, abortion, birth control, sexually transmitted diseases, the variety of forms of sexual behavior, including homosexuality and masturbation, and sexual behavior at various life stages, including pre-marital sex. The materials also discuss historical, religious, social and cross-cultural perspectives on sexuality and sexual behavior.

The texts contain various references to religion including sections on religious history, comparisons between Eastern and Western religious traditions and their approaches toward human sexuality, and explanations of the ways in which certain religious groups have modified their attitudes toward human sexuality over time. Included here is an illustrative sampling of these references, particularly the type of which plaintiffs complain.

*Sexuality Today* distinguishes between Western religions, which "have typically taken a rather sex-negative position," and Eastern religions, which "have tended to view sexuality in terms of its creative potential and its power in spiritual development." The author states: "Eastern sexual and spiritual traditions can help Westerners break out of the prevailing reduction of sexuality to genital activity." Noting changing attitudes within religious circles during the late 1960s and 1970s, the text further states that "[s]ocial turmoil, technological changes, increasing recognition of personal needs, and a sexual revolution have wreaked havoc with the meaning and relevance of the traditional Judeo–Christian sexual images, icons, images and myths of the purpose of sex...."

*Our Sexuality* teaches that Augustine's "writing formalized the notion that intercourse could take place only within marriage for the purpose of procreation" and that this "view of nonreproductive sex as sinful was modified by Protestant reformers of the sixteenth century. Both Martin Luther (1483–1546) and John Calvin (1509–1564) recognized the value of sex in marriage." In a later chapter, *Our Sexuality* asserts that "[l]aws against homosexual behaviors, which stem from biblical injunctions against same-sex contact, have historically been exceedingly punitive. People with homosexual orientations have been tortured and put to death throughout Western history." The text further notes that "[c]urrent theological positions toward homosexuality demonstrate a great range of convictions even within the Christian church." The authors expressly support the gay rights movement, they state their belief that "rigid gender roles are limiting," and they oppose "the sex-for-reproduc-

tion theme." They also state, citing their references, that "it has been widely reported by a variety of therapist researchers that severe religious orthodoxy equating sex with sin is common to the backgrounds of many sexually troubled people."

Plaintiffs do not point to any statements in the textbooks that expressly urge students to reject their religious beliefs or to adopt others. The course materials do, however, acknowledge that students' religious beliefs may have an impact on their sexual attitudes. *Sexuality Today*, for example, advises students to "[e]xamine your feelings about religion and find out what your religion has to say about sexual matters.... Many religious groups have given careful consideration to human sexuality and have devised written guides to help with personal decision making." The same chapter includes an article about a young woman who decides not to have sex with her boyfriend because "she had been taught that sexual activity was something to be shared only within the context of marriage," and "was, in fact, happy that she had stuck by her sexual values."

The handouts contain practical information on issues such as birth control, breast cancer, sexual abuse and harassment, and rape counseling as well as surveys and advice on interpersonal relationships. The homework assignments vary from section to section but include required readings from the texts, book reports and research papers. Some professors invite students to record their thoughts in course-related journals, and others require students to "try something new" such as attend a gay rights meeting, interview a clergy person, or get an HIV test or gynecological exam.

The course as a whole plainly encourages students to re-examine their understanding of and attitudes toward human sexuality. In discussing values clarification, one handout states that "[n]othing is *absolute*" and that "[w]hen you take the *absolute* out of something you begin seeing it not necessarily as *bad or good, or wrong, or right,* but ...different, and that's when *communication and understanding* of self and others can begin!" There is *no reference in this handout to* religion or religious beliefs. One professor

includes "values clarification and decision making with regard to all social issues" on a list of course-related goals. Another writes that "students will be encouraged to explore their own attitudes and feelings about each topic presented with the hope of enhancing decision making skills . . . ." A third professor encourages students to interview others, including a member of the clergy, about their values and beliefs. A fourth writes that "students will be asked to explore their own personal attitudes and feelings in a non-judgmental way." That same professor grades students in part based on her perception of their "growth" during the course.

In addition to the textbooks and handouts, plaintiffs rely on affidavits from four students who were enrolled in PED 251 at different times between 1979 and 1995. Ray Mincone, who took the course in 1995, asserts that his professor led the students in an exercise to "identify the 'inhibitions' we have acquired from our *religious upbringing,* our families, cultures and personal feelings." (emphasis in original). He also states that students in one section were required to complete a survey containing questions of a sexual nature, and that students in another were threatened with a twenty-point grade reduction for failure to be "interactive" after a classmate refused to discuss his sexual fantasies with the rest of the class. Plaintiff Gheta, who took the course in 1988 or 1989, states that she was forced to recite synonyms for the words fuck, cunt and penis and was told by the professor that female students should masturbate while watching themselves in a mirror. Madeline Basler, who took the course in 1979, asserts that her grade was reduced because she refused to watch a movie about homosexuality. Finally, Kathleen Dilg, who took the course in 1977, states that the Catholic Church and its ideology were attacked and belittled during class.

Plaintiffs also rely on affidavits from Reverend Charles T. Moss, a Catholic priest, and from Edward Eichel, who holds a masters degree from the Human Sexuality Program at New York University and has published several studies on male-female compatibility. Rev. Moss asserts in part that the course materials "stand in absolute contradiction to the entire moral teaching of the Church in the field of human sexuality" and that "[a] Catholic would be bound in conscience to avoid PED 251 as a proximate occasion of sin . . . ." Mr. Eichel, who states that he is familiar with the methodologies and philosophies behind PED 251, asserts that in "reprogramming courses of this type, the student is rewarded for changing his views to 'new' views and penalized for holding fast to his 'old' views, even though this is never explicitly stated." Mr. Eichel further states that the "course materials and exercises are . . . designed to put students on the defensive over their traditional morality in a coercive classroom setting where the instructor is in control, and to break down the students' sexual 'inhibitions' and 'outmoded' beliefs . . . by coercing them to engage in activities . . . which they might otherwise abhor."

## DISCUSSION

Motions for summary judgment are granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Lipton v. Nature Co.,* 71 F.3d 464, 469 (2d Cir.1995). The moving party must demonstrate the absence of any material factual issue genuinely in dispute. *See id.* The court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574,.587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986). The party must produce specific facts sufficient to establish that there is a genuine factual issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### Standing

To have standing, a party must show that (1) he or she has suffered an actual or threatened injury as a result of the defendant's allegedly illegal conduct, (2) the injury can be fairly traced to the challenged action, and (3)

the injury will likely be redressed by a favorable decision. *United States v. City of New York,* 972 F.2d 464, 470 (2d Cir.1992). Plaintiffs assert standing as municipal taxpayers. A municipal taxpayer's relationship to the municipality is presumed to be " 'direct and immediate,' " and the taxpayer is thought to suffer a concrete injury whenever the " 'challenged activity involves a measurable appropriation or loss of revenue.' " *Id.* at 471, *quoting District of Columbia Common Cause v. District of Columbia,* 858 F.2d 1, 5 (D.C.Cir.1988).

■ Barbara Gheta does not have standing because, as plaintiffs concede, she is no longer a resident of Nassau County. George Ehman asserts in an affidavit that he is a resident of Nassau County. Victoria Guadagna and Hugh McElhon have not submitted any proof of residence. However, it is alleged in plaintiffs' amended complaint that they are residents of Nassau County, and defendants did not contest their status as Nassau County residents until their reply brief, thereby denying plaintiffs the opportunity to offer any evidence in response. Accordingly, it is assumed that Ms. Guadagna and Mr. McElhon have satisfied the residence requirement. *See Playboy Enterprises, Inc. v. Dumas,* 960 F.Supp. 710, 720 n. 7 (S.D.N.Y.1997) (refusing to consider an argument raised in a reply brief); *See also Polycast Technology Corp. v. Uniroyal, Inc.,* 792 F.Supp. 244, 269 (S.D.N.Y.1992).

■ Plaintiffs have provided evidence that one fourth of NCC's annual budget comes from Nassau County taxes and that $2,356,539 of the budget is allocated to the department whose faculty members teach PED 251. Nevertheless, defendants argue that plaintiffs have failed to establish that PED 251 is funded by a *measurable* appropriation of Nassau County's revenue. Defendants assert that municipal funds are intermingled with funds from other sources before being allocated among NCC's academic departments and that plaintiffs have no evidence that the inclusion of alleged anti-religious subject matter actually increases the cost of offering PED 251. Defendants further argue that any allegation of generalized injury resulting from the entire cost of offering the course, not simply the challenged portions, is insufficient. Finally, defendants contend that plaintiffs'. ideological disagreement with the course is insufficient to establish an injury because plaintiffs are neither students nor parents of students in the course.

Despite the intermingling of funds, since plaintiffs have shown that one fourth of NCC's budget comes from Nassau County taxes, it is reasonable to infer that some measurable amount of municipal revenue is used to fund the challenged portions of PED 251. See *City of New York,* 972 F.2d at 470 (noting Supreme Court's "ringing endorsement" of municipal taxpayer standing and holding that municipal taxpayer had standing to contest the legality of the city's contract with waste disposal organizations); *Board of Educ. of Mt. Sinai Union Free School Dist. v. New York State Teachers Retirement System,* 60 F.3d 106, 110–11 (2d Cir.1995). Thus, plaintiffs Ehman, Guadagna and McElhon have standing to contest the constitutionality of PED 251. Plaintiff Gheta does not.

## Establishment Clause Claim

Plaintiffs assert that PED 251 violates the Establishment Clause of the First Amendment to the United States Constitution, which provides that "Congress shall make no law respecting an establishment of religion . . . ," and which applies to state governments through the Fourteenth Amendment. *Everson v. Board of Educ. of Ewing Tp.,* 330 U.S. 1, 8, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

The threepronged test of *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), endures as a starting point of Establishment Clause analysis, even as the content of the test, particularly of the "effect" prong, has undergone refinement. *See Agostini v. Felton,* 521 U.S. 203, 222–23, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). *Lemon* requires a challenged government practice (1) to have a secular purpose, (2) to have a primary effect that neither advances nor inhibits religion, and (3) not to foster excessive state entanglement with religion. *Lemon,* 403 U.S. at 612–13, 91 S.Ct. 2105. In 1984, Justice O'Connor suggested that the Court refine the *Lemon* test by focusing on whether the challenged government practice "en-

dorses" religion. *See Lynch v. Donnelly,* 465 U.S. 668, 688–693, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring). Under Justice O'Connor's analysis, the challenged conduct impermissibly endorses religion if it has either the purpose or effect of "communicating a message of government endorsement or disapproval of religion." *Id.* at 691–92, 104 S.Ct. 1355. *See also Agostini,* 521 U.S. at 223, 117 S.Ct. 1997 et seq. In considering the conduct's effect, the question of endorsement is evaluated from the perspective of a "reasonable observer." *See Wallace v. Jaffree,* 472 U.S. 38, 76, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring). Here, as has been done in other school-related Establishment Clause cases, the *Lemon* test will be applied, along with the endorsement test. *See e.g., Bauchman v. West High School,* 132 F.3d 542, 552 (10th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 2370, 141 L.Ed.2d 738 (1998); *Hsu By and Through Hsu v. Roslyn Union Free School Dist. No. 3,* 85 F.3d 839, 864–67 and n. 26 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 608, 136 L.Ed.2d 534 (1996).

■ Plaintiffs do not contest defendants' showing that PED 251 has the secular purpose of teaching students about human sexuality as an academic subject. Therefore, defendants have established the absence of a violation of the purpose prong of *Lemon.*

■ Plaintiffs argue that PED 251 involves an excessive entanglement between government and religion by "subject[ing] impressionable students to a barrage of dogmatic pronouncements against the Judeo–Christian sexual ethic and in favor of Eastern spirituality" and requiring the students to engage in "values clarification." In considering the question of entanglement, a court must examine the character and purposes of the institution benefitted, the nature of the assistance provided by the State, and the resulting relationship between the government and the religious entity. *See Agostini v. Felton,* 521 U.S. at 232, 117 S.Ct. 1997.

The objective of the entanglement inquiry "is to prevent, as far as possible, the intrusion of either into the precincts of the other." *Lemon,* 403 U.S. at 614, 91 S.Ct. 2105. Relevant factors include whether the textbooks and other class materials are published by anyone with a religious affiliation and whether the school officials in charge of selecting the curriculum have had dealings with any religious organizations. *See Fleischfresser v. Directors of School Dist. 200,* 15 F.3d 680, 689 (7th Cir.1994). Here, there is no evidence that the NCC curriculum committee, in selecting the curriculum for PED 251, has had any dealings with, connections to or involvement with any religious or anti-religious organizations, or that the textbooks were published by companies with religious or anti-religious affiliations. Therefore, plaintiffs cannot show entanglement under *Lemon.*

The crux of plaintiff's Establishment Clause claim is that PED 251 has the effect of disparaging the Judeo–Christian sexual ethic while promoting "sexual pluralism." Citing to passages from the textbooks and handouts,[1] plaintiffs argue that PED 251 proselytizes against religion by criticizing the Judeo–Christian sexual ethic while simultaneously teaching students that there is no absolute truth. Referring to certain course-related exercises and materials, plaintiffs also argue that the course is designed to change students' attitudes about sex. Plaintiffs contend that the ultimate goal of such anti-religious proselytizing, coupled with the professors' "attitude restructuring techniques," is to alter students' religious beliefs. Indeed, plaintiffs point out that certain professors grade students on their change in attitude during the course. Finally, plaintiffs contend that the student affidavits establish a pattern of coercion aimed at forcing students to overcome their sexual inhibitions.

"The analytical difficulty with plaintiffs' approach is that it tends to divide the universe of value-laden thought into only two categories—the religious and the anti-religious. . . .

---

1. Plaintiffs have identified all of the passages from the textbooks and the handouts that they claim support the inferences they ask the court to draw. This Opinion and Order reflects an examination of all such passages, as well as those cited by the parties during oral argument on the motion, in the context of the materials as a whole. *See Lynch,* 465 U.S. at 680, 104 S.Ct. 1355.

If the establishment clause is to have any meaning, distinctions must be drawn to recognize not simply 'religious' and 'anti-religious,' but 'non-religious' governmental activity as well." *Grove v. Mead School District No. 354,* 753 F.2d 1528, 1536 (9th Cir.), *cert. denied* 474 U.S. 826, 106 S.Ct. 85, 88 L.Ed.2d 70 (1985) (Canby, J., concurring). *Accord Smith v. Board of School Commissioners of Mobile County,* 827 F.2d 684, 692 n. 9 (11th Cir.1987). Insofar as the Establishment Clause is concerned, the terms "secular" and "anti-religious" must be regarded as separate and distinct. *See Grove,* 753 F.2d at 1536.

That the course materials, and the textbooks in particular, contain passages antithetical to plaintiffs' religious beliefs is not in dispute.[2] However, "[t]he Establishment clause is not violated because government action happens to coincide or harmonize with the tenets of some or all religions." *Fleischfresser* 15 F.3d at 689 (quotation omitted). "There is and can be no doubt that the First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any religious sect or dogma." *Epperson,* 393 U.S. at 106, 89 S.Ct. 266. And, there can be no legitimate state interest in protecting religious persons from views that are "distasteful to them." *Edwards v. Aguillard,* 482 U.S. 578, 591, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (quoting *Epperson,* 393 U.S. at 107, 89 S.Ct. 266). If it were unconstitutional to require students to read books in which concepts coinciding with their religious beliefs came under question, then thousands of college courses throughout the country would be invalidated, including courses on philosophy, history, religion, literature, and biology. *Cf. Wallace,* 472 U.S. at 69–70, 105 S.Ct. 2479 (O'Connor, J., concurring, finding that "[c]haos would ensue" if every statute having a primary effect of helping or hindering a secular belief that coincided or conflicted with some persons' religious interests were invalidated).

The dispositive issue is not whether the course materials contain statements that conflict with the beliefs of certain religious groups, but whether the inclusion of such statements communicates a message of government endorsement or disparagement of religion. In determining whether the materials communicate such a message, the materials must be examined as a whole. *See Lynch,* 465 U.S. at 680, 104 S.Ct. 1355. The professors' syllabi demonstrate that PED 251 covers a wide variety of subjects, many of which have no bearing on plaintiffs' religious beliefs. When religion is mentioned, it is discussed from an historical, descriptive perspective, and the authors include citations to the reference materials on which they rely. Other references recognize that religious beliefs form one basis for individuals' attitudes toward sexual behavior.

Viewing the evidence in the light most favorable to plaintiffs, the materials as a whole are designed to teach students about human sexuality as an academic subject, and not about religion. The references to religion have the effect of providing an historical and social context for the discussion on human sexuality and do not either indoctrinate students in a particular religion or disparage a particular religion or all religions. These distinctions between acknowledging differing religious views and supporting a particular religious view, and between expounding views based upon secular considerations and expounding religious beliefs, are bound to be understood by a reasonable student taking courses at NCC. *Cf. Lynch,* 465 U.S. at 692, 104 S.Ct. 1355 (holding that the context, *i.e.,* "the overall holiday setting," affected what viewers understood to be the purpose of a town's Christmas display, which included a nativity scene).

It remains to be addressed whether what plaintiffs call the professors' "attitude restructuring techniques," coupled with the course materials, have the effect of disparag-

---

**2.** Also, the student affidavits contain allegations which, if true, indicate the use of bizarre teaching techniques. However, the appropriateness of the professors' behavior and/or the course materials is not at issue. Schools have wide discretion to select their curricula. Courts are not permitted to inject themselves into controversies regarding the daily operations of schools unless fundamental constitutional rights are "directly and sharply implicate[d]." *See Epperson v. State of Ark.,* 393 U.S. 97, 104–05, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968).

ing religion. The professors encourage students to explore their attitudes and values. However, plaintiffs' contention that this communicates a disparagement of religion because students who do not express the right, *i.e.,* "secular," views are downgraded is without merit. The materials as a whole do not discredit religion as a source of morals or values or as a system of belief. Nor have plaintiffs provided any evidence from which it can be reasonably inferred that the professors force students to adopt particular religious or anti-religious views. *Sexuality Today* counsels students to explore the tenets of their own religious groups in forming their values. The same professor who encourages students to record changes in their perceptions and attitudes during the course, also encourages students to interview others, including a member of the clergy. And the professor who grades students in part on their "growth" during the course also writes that "students will be asked to explore their own personal attitudes and feelings in a non-judgmental way." In *Smith v. Board of School Commissioners of Mobile County,* 827 F.2d 684, 692–93 (11th Cir.1987), the court held that home economics, history and social studies books which instilled values such as independent thought, tolerance of diverse views and decision-making had a religiously neutral effect on students and did not promote "secular humanism" at the expense of theistic religion. In fact, the court noted that many of the books acknowledged religion as a source of values, or at the least did not preclude that possibility. *See id.* at 692. The same is true here. As the court in *Smith* stated:

> While the Supreme Court has recognized that the State may not establish a religion of secularism in the sense of affirmatively opposing or showing hostility to religion, thus preferring those who believe in no religion over those who do believe, . . . that Court also has made it clear that the neutrality mandated by the establishment clause does not itself equate with hostility towards religion. . . . Rather, the separation of church and state mandated by the first amendment rests upon the premise that both religion and government can best work to achieve their lofty aims if each is

left free from the other within its respective sphere.

*See id.* (citations and quotations omitted).

Plaintiffs fail to recognize the distinction between the encouragement of *religious* beliefs, as to which there is no evidence whatsoever, and the encouragement of attitudes from the perspective of science, whether physiology or psychology, and from the perspective of history or other non-religious sources. Undoubtedly, the very idea of discussing, much less treating as viable options, some of the sexual behaviors that are included in the course, contradicts the religious beliefs of the plaintiffs. But that does not make the discussions an establishment of religion.

The opinions of plaintiffs' experts do not raise issues of fact requiring trial. The experts confirm plaintiffs' position that the views expressed both by the professors and the materials are antithetical to their religious beliefs. But, as stated above, it is not unconstitutional to criticize principles that happen to coincide with the religious teachings of certain groups. The mere existence of uncontroverted affidavits, therefore, does not raise a genuine issue of material fact. *See Edwards,* 482 U.S. at 595–96, 107 S.Ct. 2573. In addition, since plaintiffs, who are not students in the course, seek only prospective relief, the outdated student affidavits are of little or no value to plaintiffs' case. The most recent affidavit is that of Ray Mincone, who took the course in 1995. Even if treated as current, it is insufficient to raise an issue of fact as to whether the course, taken as a whole, endorses or disparages religion. That the exercises Mr. Mincone complains of were distasteful to him do not make them a violation of the Establishment Clause.

Plaintiffs' reliance on the coercion standard applied in *Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), is also misplaced. The students in that case were high school seniors, and the prayer ceremony at issue took place on graduation day. The Court's holding that the ceremony violated the Establishment Clause was based on its findings that high school students are

impressionable, *see Weisman,* 505 U.S. at 581, 112 S.Ct. 2649, and that attending one's high school graduation is not a voluntary activity, *see id.* NCC students, however, are adults whose average age is over twenty-five, and PED 251 is an elective, *i.e.,* voluntary course. *See Chaudhuri v. State of Tenn.,* 130 F.3d 232, 237 (6th Cir.), *cert. denied,* — U.S. —, 118 S.Ct. 1308, 140 L.Ed.2d 473 (1998); *Tanford v. Brand,* 104 F.3d 982, 985 (7th Cir.), *cert. denied,* — U.S. —, 118 S.Ct. 60, 139 L.Ed.2d 23 (1997) (distinguishing *Lee* and finding that invocation and benediction during voluntary college graduation did not violate the Establishment Clause).

The students who choose to take PED 251 are not obliged to participate in any religious rituals, but simply to read materials and engage in conversations in which religion is mentioned and values and morals are discussed. In *Brown v. Woodland Joint Unified School Dist.,* 27 F.3d 1373, 1380 (9th Cir.1994), a teaching curriculum which asked elementary school children to discuss witches, pretend that they were witches or sorcerers, and/or to create poetic chants was found not to violate the Establishment Clause because it did not require children to practice the "Wicca" religion, but merely to read, discuss and/or contemplate witches. Similarly, the reasonable NCC student understands that "to pose questions is not to impose answers," *Grove,* 753 F.2d at 1541 (Canby, J., concurring), and that she may read a book or participate in a class discussion in which certain views are questioned without having to compromise her religious beliefs. That a college student may disagree on religious grounds with the perspective offered by her teacher or textbook does not amount to a violation of the First Amendment.

In fact, the relief sought by the plaintiffs would itself result in a violation of the Establishment Clause. Allowing religious groups to dictate the curriculum of a public college would have the direct and obvious effect of endorsing those groups' religious views. Thus, in *Edwards,* 482 U.S. at 596, 107 S.Ct. 2573, the Supreme Court struck down a Louisiana law that required public schools which taught evolution to instruct students in the theory of "creation science" because it impermissibly advanced a religious doctrine "by requiring either the banishment of the theory of evolution from public school classrooms or the presentation of a religious viewpoint that rejects evolution in its entirety." In addition, assuming that only those materials expressly found objectionable by plaintiffs were to be considered, the school would become involved in deciding which statements are offensive to plaintiffs' religious views and which they approve. Such an enterprise would be a paradigm of improper entanglement.

### CONCLUSION

For the above-stated reasons, defendants' motion for summary judgment is granted, and the Clerk of Court is directed to enter judgment for the defendants.

**SO ORDERED.**