Kristopher **OKWEDY** and Keyword Ministries, Inc., Plaintiffs,

v.

Guy V. **MOLINARI**, individually and in his official capacity as President of the Borough of Staten Island, New York, PNE Media, LLC, John Doe Nos. 1–5, and Jane Doe Nos. 1–5, Defendants.

No. 00CV5426NGCLP.

United States District Court,
E.D. New York.

July 18, 2001.

Michael J. DePrimo, American Family Association Center for Law & Policy, Tupelo, MS, for plaintiff.

Dana Biberman, Corporation Counsel of the City of New York, New York City, Donald Rosenthal, Rosenthal Judell & Uchima, New York City, for defendants.

## MEMORANDUM AND ORDER

GERSHON, District Judge.

Plaintiffs, who bring this action under federal civil rights statutes, 42 U.S.C. §§ 1983, 1985(3) and 1986, allege that the defendants' conduct deprived them of their rights under the Free Speech, Establishment and Free Exercise Clauses of the First Amendment and their right to Equal Protection. They claim that plaintiffs were discriminated against on the basis of their religious beliefs and viewpoint against homosexuality and that the official statements and actions of public officials violated the First Amendment's requirement of neutrality in matters pertaining to religion. The complaint also asserts supplemental state statutory and common law claims of discrimination, tortious interference with contract and breach of contract. Plaintiff Kristopher Okwedy describes himself as an ordained minister and pastor of plaintiff "Keyword Ministries, a Christian church," incorporated as a not-for-profit corporation in New York. Guy V. Molinari, named as a defendant individually and in his official capacity, is the Borough President of Staten Island. Defendant PNE Media, LLC, produces and displays billboards for customers. The complaint seeks injunctive and declaratory relief, specific performance, actual damages, punitive damages, and costs and attorneys' fees. The defendants move to dismiss the federal claims in the complaint pursuant to Rule 12(b)(6) for failure to state a claim. Molinari also argues that the complaint against him should be dismissed pursuant to the doctrine of qualified immunity. Defendants also request that the court decline to exercise supplemental jurisdiction over state law claims.

## ALLEGATIONS OF THE COMPLAINT

The complaint's factual allegations are taken as true for purposes of the motion. The complaint alleges that plaintiff Okwedy holds a religiously-based belief that homosexuality is a sin and that he "owes a duty to God to expose [that] sin". Keyword Ministries is "dedicated to promoting traditional biblical values, which includes teaching that homosexual behavior is a sin". Plaintiffs characterize themselves as "members of a class of religious persons who engage in conspicuous, sustained, and overt public displays of sacred religious text as evidence of the sinfulness of homosexuality." Plaintiffs entered into contracts with PNE for the design, production

and display of two billboard signs in Staten Island, each for display for a one month period, and paid the full amounts due under the contracts and other costs (a total of $1,565.68 on the first contract and $950 on the second). Under the terms of the first contract, which is attached to the complaint, PNE was responsible for design and production of the sign, subject to plaintiff Okwedy's approval of the artwork.

PNE posted the signs on two billboards in Staten Island on March 3, 2000. The signs consisted of four rectangles, each containing in large capital letters a different version of a verse from the Bible, with attribution of the source, *e.g.*, "Thou Shall Not Lie With Mankind As With Womankind: It Is Abomination (King James)." The other versions used the terms "Detestable", "Loathsome" and "Enormous Sin". The Biblical verse is identified across the top of the signs: "Four Ways to Say Leviticus 18:22." At oral argument, plaintiffs' counsel acknowledged that the purpose of putting those quotes on a billboard was to express a message against homosexuality. The complaint states that "the billboards were located in or near neighborhoods containing a significant number of persons who either engaged in or approved of homosexual conduct." The billboards identified PNE, but they did not identify the sponsor of the message, an omission that was commented upon in an article in the Staten Island *Advance* that is attached to the complaint. The complaint states that "the signs stirred public opposition among the homosexual community, its supporters, and borough politicians." The Staten Island *Advance* article describes the "outrage" voiced by various spokesmen for gay rights over the billboards. For example, the president of Staten Island Cares, described as an organization that raises money for people with AIDS, condemned the billboards as "a blatant display of hatred." A letter from the Anti-Defamation League dated March 10, 2000, which is attached to the complaint, commends Borough President Molinari for his condemnation of the billboards, stating, "you were quite correct to call the billboard mean-spirited and to recognize it as a potential danger to the well-being of people who are, or are perceived to be, members of the gay and lesbian community."

On March 8, 2000, Molinari faxed a letter to PNE's New Jersey office. The full text of the letter, on official stationery, is as follows:

> For the last two days we have attempted to contact your office, without success, at your listed telephone number (908) 810–1176.
>
> I write regarding the recent appearance on two of your Staten Island billboards of four translations of Leviticus 18:22. As you are probably aware this particular biblical verse is commonly invoked as a biblical prohibition against homosexuality.
>
> The sponsor for the billboard message is nowhere apparent on the billboard, so I am writing to you with the hope that I can establish a dialogue with both yourself and the sponsor as quickly as possible.
>
> Both you and the sponsor of this message should be aware that many members of the Staten Island community, myself included, find this message unnecessarily confrontational and offensive. As Borough President of Staten Island I want to inform you that this message conveys an atmosphere of intolerance which is not welcome in our Borough.
>
> P.N.E. Media owns a number of billboards on Staten Island and derives substantial economic benefits from them. I call on you as a responsible member of

the business community to please contact Daniel L. Master, my legal counsel and Chair of my Anti–Bias Task Force at (718) 816–2056 to discuss further the issues I have raised in this letter.

Later that same day (and, plaintiffs allege, in response to the Molinari letter), PNE covered over the billboards and issued a press release stating that it had done so because the billboards failed to comply with PNE's "standard requirement that all advertising disclose the identity of the advertiser." The press release also quoted PNE's attorney as stating that the message did not represent PNE's views and that PNE did not discriminate based on sexual orientation, although it "respects its advertisers' free speech rights." PNE's counsel faxed a copy of the press release to Daniel Master, the official identified in the Molinari letter. The complaint alleges that PNE's purported reason for removing the signs is a pretext and points out that the written contracts did not provide for disclosure of the identity of the advertiser and that PNE was responsible for production of the billboards. Instead, the complaint asserts, on information and belief, that the signs were removed "because of Defendant Molinari's threat of future economic harm."[1] At oral argument, when questioned as to the basis for the assertion that Molinari had threatened PNE, plaintiffs' counsel relied solely upon the March 8 letter. Plaintiffs also allege, based on the content of the letter, that Molinari's purpose in sending it "was to express official government disapproval of the religious viewpoint conveyed by Plaintiffs."

In response to a letter from plaintiffs' counsel demanding that the signs be reposted, PNE returned the full contract price by check, which plaintiffs did not cash. Plaintiffs further allege that they have been unable to display their message on other billboards in Staten Island because other vendors either declined to accept it or insisted on a minimum six-month rental, which plaintiffs cannot afford.

## DISCUSSION

### A. Standard for Motion to Dismiss

On a motion to dismiss, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The court "must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir.1995) (quoting *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir.), *cert. denied*, 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994)). However, vague and conclusory allegations of a "conspiracy" to violate civil rights and a defendant's participation in such a conspiracy are properly disregarded where the specific allegations of the complaint do not amount to an agreement to violate the plaintiff's civil rights. *X–Men Security, Inc. v. Pataki*, 196 F.3d 56, 71 (2d Cir. 1999). A motion to dismiss "is addressed solely to the face of a pleading, and '[t]he court's function . . . is not to weigh the

1. Although the complaint at one point alludes to an "agreement" by Molinari and PNE to remove plaintiffs' signs, the complaint repeatedly asserts that PNE acted under government compulsion, alleging that: "Molinari threatened PNE with future economic harm unless they removed Plaintiffs' signs from the billboard"; PNE removed the signs "because of Defendant Molinari's threat of future economic harm"; and "[t]he actions of PNE in removing Plaintiffs' signs constituted state action because Defendant Molinari's veiled threat of future economic harm coerced PNE to remove the signs".

evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient.'" *Tinlee Enterprises, Inc. v. Aetna Casualty & Surety Co.,* 834 F.Supp. 605, 607 (E.D.N.Y. 1993) (quoting *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985)).

## B. Claim of Infringement of Free Speech

■ The First Amendment applies to governmental action, not to actions by private individuals that impinge upon another person's ability to disseminate a message. "[T]he guarantees of free speech and equal protection guard only against encroachment by the government and 'erec[t] no shield against purely private conduct.'" *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston,* 515 U.S. 557, 566, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995) (quoting *Shelley v. Kraemer,* 334 U.S. 1, 13, 68 S.Ct. 836, 92 L.Ed. 1161 (1948)); *see Loce v. Time Warner Entm't Advance/Newhouse P'ship,* 191 F.3d 256, 266 (2d Cir.1999). Accordingly, unless the decision of PNE to remove plaintiffs' message from its billboards is attributable to unconstitutional actions by public officials, plaintiffs' First Amendment free speech rights have not been violated and no claim under Section 1983 is stated.

Public officials have no right to prohibit or restrict plaintiffs' speech because they disagree with its content, no matter how offensive they or their constituents consider the message to be. "The very idea that a noncommercial speech restriction be used to produce thoughts and statements acceptable to some groups or, indeed, all people, grates on the First Amendment, for it amounts to nothing less than a proposal to limit speech in the service of orthodox expression. The Speech Clause has no more certain antithesis." *Hurley,* 515 U.S. at 579, 115 S.Ct. 2338 (upholding

right under First Amendment of private organizers of St. Patrick's Day parade to deny permission to march to gay pride group of persons of Irish descent). The Supreme Court recently held that the Boy Scouts had a First Amendment right to exclude from membership a gay scoutmaster notwithstanding New Jersey's prohibition of discrimination based on sexual orientation, because the Court found that the exclusion was part of the group's association for expressive activity. *Boy Scouts of America v. Dale,* 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000). The Court stated that the fact "that homosexuality has gained greater social acceptance ... is scarcely an argument for denying First Amendment protection to those who refuse to accept these views. The First Amendment protects expression, be it of the popular variety or not. . . . [T]hat an idea may be embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view." *Id.* at 660, 120 S.Ct. 2446 (citations omitted). And the "fact that the messages conveyed by those communications may be offensive to their recipients does not deprive them of constitutional protection." *Hill v. Colorado,* 530 U.S. 703, 715, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000).

Plaintiffs' efforts to proselytize also enjoy constitutional protection: "The right to free speech, of course, includes the right to attempt to persuade others to change their views," although "the protection afforded to offensive messages does not always embrace offensive speech that is so intrusive that the unwilling audience cannot avoid it." *Id.* at 716, 120 S.Ct. 2480 (upholding restrictions on speech-related conduct without consent of the listener near the entrance to a health care facility against claims by anti-abortion protesters of First Amendment violation). Moreover, that plaintiffs had not identified themselves on

their billboards did not deprive their message of First Amendment protection. "Anonymity is a shield from the tyranny of the majority." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (prohibition against distribution of anonymous campaign literature violated First Amendment).

But plaintiffs' right to free speech under the First Amendment does not include a right to be shielded from criticism from others, including public officials, who also have a right to express their views. *X–Men*, 196 F.3d at 68–70. Defendant Molinari does not contend that he had a right to suppress or censor speech. Instead, he argues that, in criticizing plaintiffs' billboard as conveying an unwelcome message of intolerance, he simply exercised his own right to voice his concerns and the concerns of his constituents, and that his condemnation of intolerance accords with the City's anti-discrimination law, which forbids discrimination on the basis of sexual orientation. N.Y.C.Admin.Code §§ 8–101 *et seq.* *See generally Levin v. Yeshiva University*, 96 N.Y.2d 484, 2001 WL 735762 (N.Y., July 2, 2001) (discussing this provision of the New York City Human Rights Law). Defendant Molinari's letter, which is the sole basis for plaintiffs' claim of unlawful government coercion and therefore responsibility for PNE's removal of the signs, falls within the boundaries of permissible expression by public officials that the Second Circuit has recognized.

*Hammerhead Enterprises, Inc. v. Brezenoff*, 707 F.2d 33 (2d Cir.), *cert. denied*, 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983), is strikingly similar to this case. There, the creators of a board game which harshly lampooned the welfare system claimed that their First Amendment rights had been violated by a letter from the defendant Brezenoff, Administrator of the New York City Human Resources Administration, which condemned the game and urged major department stores not to carry it. The game had provoked a storm of criticism nationwide from "outraged spokesmen for impoverished citizens." *Id.* at 36. The Brezenoff letter, drafted by Brezenoff and his close aides and sent on official stationery like Molinari's letter, began, "I am writing to urge that [store] refrain from carrying this game in its stores," and closed by assuring that "[y]our cooperation in keeping this game off the shelves of your stores would be a genuine public service." The letter called the game "an ugly and damaging slam at this society's poorest citizens," and stated that it "does a grave injustice to taxpayers and welfare clients alike; by its insensitivity and plain shoddiness, it is a discredit to those associated with its manufacture and marketing." *Id.* at 36–37 & n. 2. The agency that Brezenoff headed did not have regulatory authority over department stores, nor did Brezenoff contact any government agency that did. Here, the Borough President's duties are set forth in N.Y.C. Charter § 82 and do not include regulatory authority over billboards. The authority to issue permits for signs and billboards is conferred upon the Department of Buildings. N.Y.C. Charter, c. 26; N.Y.C.Admin.Code §§ 27–147, 27–177, 27–178.

The Second Circuit in *Hammerhead* held that the district court had properly found after a bench trial that the rights of the plaintiffs had not been violated by Brezenoff's attempt to persuade the stores not to carry the game, and that a public official's "appeal to conscience and decency" could not be equated with government censorship. *Hammerhead*, 707 F.2d at 38–39. The court explained that statements by public officials sometimes "will require courts to draw fine lines be-

tween expressions of personal opinion and implied threats to employ coercive state power to stifle protected speech," *id.* at 39, such as where the comments "can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request." *Id.* Brezenoff's letter, the court found, was not reasonably susceptible to a threatening interpretation, since it did not refer to adverse consequences that might follow, the agency did not have authority over the department stores, and apparently no stores were influenced. *Id.* The court rejected the arguments that Brezenoff acted improperly in communicating directly with department stores or that the First Amendment "require[d] public officials to communicate only through the media," *id.*, and it dismissed as "spurious" the argument that "merely writing to a private party constituted a government conspiracy to censor." *Id.* at n. 8.

The Second Circuit summarized its holding and appraisal of the case in language appropriate to plaintiffs' challenge to the Molinari letter:

> This case, however, does not involve attempts by government to censor the unorthodox or the insurgent.... Apparently, appellants believe the First Amendment shields their own critique from any form of official criticism. In our view, this approach would stand the Constitution on its head.... Having boldly entered the flames of public discussion the First Amendment specifically is designed to kindle, appellants now seek our rescue from the sparks of controversy they ignited. In the absence of any evidence that Brezenoff or any New York City official attempted to do more than express his view concerning the distasteful nature of appellants' inven-

tion, we decline to come to their assistance.

*Id.* at 35.

Molinari's letter, like Brezenoff's, is not reasonably susceptible to a threatening interpretation, and he did not have regulatory authority over PNE's business, notwithstanding plaintiffs' assertion that Molinari's letter contained threatening language that was absent from the Brezenoff letter. The Molinari letter merely expressed his agreement with the view of others in Staten Island that the billboard message was "unnecessarily confrontational and offensive" and that, as Borough President, he considered that "this message conveys an atmosphere of intolerance that is not welcome in our Borough." Plaintiffs claim that the letter threatens investigative action. Its text will not support that interpretation; it requests "a dialogue" with both PNE and the sponsor of the billboard whose identity was not yet known, and requests that PNE contact Daniel Master, Molinari's legal counsel and head of his anti-bias task force, "to discuss further the issues I have raised in this letter." The letter's appeal to PNE "as a responsible member of the business community" is precisely the kind of "appeal to conscience and decency" that *Hammerhead* upheld as proper conduct by a public official.

Nor can the letter's statement that PNE "derives substantial economic benefits" from its Staten Island billboards reasonably be construed as a threat. The statement on its face is part and parcel of the appeal to PNE as a responsible member of the business community and does not state or imply that PNE will suffer government retribution if it declined to heed Molinari's wishes. Constitutionally-protected expression does not become unlawfully coercive because the assertions are vigorous. *See R.C. Maxwell Co. v. Borough of New*

*Hope,* 735 F.2d 85 (3d Cir.1984) (following *Hammerhead* and holding that town officials did not violate rights of lessee of billboards by letter to lessor which successfully urged it to remove the billboards, mentioned a pending billboard ordinance and the possibility of legal action under that ordinance, and stated, "I am sure you are interested in being responsive to this community; and not only is this billboard incongruous to the ambience of the community, it further offends us by advertising business located outside of this community," *id.* at 86 n. 2). In fact, the Molinari letter did not ask PNE to do anything except talk, unlike the Brezenoff letter which urged the stores to boycott plaintiffs' game. Moreover, when asked at oral argument about the possible existence of evidence of coercion, plaintiffs' counsel relied only upon the letter, and did not indicate anything he thought he could find if the case went forward except that PNE decided to accede to the wishes of the Borough President because of his position, that PNE was afraid of being accused of intolerance, and that Molinari enlisted the assistance of some members of his staff in an effort to induce PNE to remove the billboards.

*Hammerhead* recognized, but did not decide, the possibility of a claim under the First Amendment if "the distribution of items containing protected speech has been deterred by official pronouncements," since the evidence did not support that inference, 707 F.2d at 39, nor did the court need to "address the competing First Amendment considerations of Brezenoff's own right to speak," *id.* at n. 6. However, the Second Circuit subsequently held that the right of public officials and legislators to express their views and to voice what they perceive to be the concerns of their constituents is protected by the First Amendment. *X–Men,* 196 F.3d at 68–72 (legislators had First Amendment right to

denounce a group and to criticize granting a publicly-funded contract to it); *Connell v. Signoracci,* 153 F.3d 74, 82 (2d Cir.1998) (mayor's "own undoubted right under the First Amendment to mobilize public opinion on subject of topless bars" included privilege "to organize a rally against pornography, to call the topless bars a 'black eye on the community' and a 'slimy business,' and to call for a boycott of the establishments").

In *X–Men,* the Second Circuit reversed the district court's denial of a motion by legislators to dismiss the complaint for failure to state a claim and on qualified immunity grounds, and applied the principles of *Hammerhead* to find that the legislators had engaged in privileged conduct which did not violate any right of plaintiffs. There, a privately-owned housing complex that received a significant level of state and federal funding, and that was subject to regulation and oversight by state and federal authorities, allegedly declined to renew X–Men's contract to provide security services because of statements made by defendants, including the Congressman and State Assemblyman whose districts included the housing complex, that were claimed to be motivated by racial and religious prejudice. Among other steps, the legislators publicly denounced X–Men as a "hate group" and "racist". The legislators also sent a letter to the State Division of Housing and Community Renewal, the agency with jurisdiction to regulate the complex and approve certain of its contracts, which accused X–Men and its principal owner of hating Jews, women, Catholics and others, and of engaging in fraudulent activity, expressed difficulty understanding how X–Men could be eligible for a state supported contract, and urged termination of the contract. When these efforts were unsuccessful, the legislators asked HUD and a Congressional commit-

tee to investigate the group, ridiculed HUD's findings in favor of the group, and continued to press for removal of X–Men as provider of services for the complex until the contract was not renewed. *Id.* at 61–62. The district court found that the complaint stated claims against the legislators for retaliation on account of X–Men's association with the group and individual denounced by the legislators, the Nation of Islam and Rev. Louis Farrakhan, in violation of the First Amendment and the Equal Protection Clause, and that determination of the legislators' assertion of qualified immunity was premature before discovery had taken place. *Id.* at 63–64.

The Second Circuit in reversing found it critical that "the legislators were not the decisionmakers," and that they had "no power to control the award of contracts." *Id.* at 68. That being the case, plaintiffs had no constitutional right to require the legislators to refrain from the speech and advocacy in which they engaged. *Id.* at 68–70. The court noted that "[o]ne does not lose one's right to speak upon becoming a legislator," *id.* at 69, and that the legislators' right to publicly criticize granting of a contract to a particular entity and to urge that it contravened public policy was protected by the First Amendment. *Id.* at 70. Further, in language applicable to plaintiffs' accusation that Molinari's letter violated their rights, the court stated: "To the extent that plaintiffs mean to assert that the rights of X–Men's employees to associate with others with whom they share religious beliefs should take precedence over other persons' speech rights, they are wrong." *Id.* The court also found it inappropriate to deny dismissal on the basis of the complaint's conclusory allega-

tions of a "conspiracy" and the exertion of "pressure" where the "only concrete acts ascribed to [the legislators] are attending meetings, making statements, and writing letters." *Id.* at 71.

In this case, similarly, the only concrete allegations against Molinari in the complaint are that he made public statements and wrote a letter, and the complaint infers from the letter's reference to Mr. Master that Molinari must have met with him and possibly other members of his staff. The complaint does not state a claim based on those activities, and the complaint's conclusory allegations of conspiratorial activity and of the use of veiled threats of future economic harm does not save it.[2]

Plaintiffs correctly note that, unlike *Hammerhead,* where Brezenoff's letter apparently did not cause any department store to alter its plans, the complaint alleges that PNE's decision to remove plaintiffs' message was induced by Molinari's letter. For purposes of this motion, the court accepts these allegations as true. The close proximity between the letter's transmission to PNE and PNE's actions, its sending of a copy to Mr. Master, and the absence of a specific provision in the contracts between plaintiffs and PNE requiring identification of the sponsor of the signs that is asserted by PNE as reason for its action, suggest that the public outcry, including Molinari's criticism, may have contributed to PNE's removal of plaintiffs' message. The court rejects the argument that this distinction requires a result different from *Hammerhead* and *X–Men.* Protected speech under the First Amendment does not become unprotected because it is effective. If, as these cases

---

**2.** Although *X–Men* technically reversed the district court's holding on qualified immunity, the Second Circuit did so on the basis of its holding that the complaint failed to state a claim that the defendants' conduct violated any constitutional right of plaintiffs. *Id.* at 65–66, 72.

held, public officials who did not have decisionmaking authority in a matter had a right to persuade others not to deal with certain individuals or to participate in disseminating their message because the public officials found the views of those individuals or their associates to be repugnant, they cannot be found to have acted unconstitutionally because their efforts to persuade others were successful. *See R.C. Maxwell Co.*, 735 F.2d at 89 (although owner of land admitted that it removed the billboards in part to ingratiate itself with officials, whose letters expressed the community's distaste for the billboards but did not contain "enforceable threats," its "desire to create a receptive climate" did not transform private action into state-coerced action. "Businesses are naturally sensitive to their images in the community.").

*Rattner v. Netburn*, 930 F.2d 204 (2d Cir.1991), relied upon by plaintiffs, is different. There, a Village Trustee who was well known as the right hand man of the Mayor, responded to an advertisement in a Chamber of Commerce publication that criticized Village policy by sending a letter to the Chamber stating that it appeared to have "crossed the line between being a supportive, nonpartisan, and nonpolitical local organization to one that has a political agenda and purpose." The letter then sought answers to a series of "questions", including which members approved the decision to run the ad. The letter added that "healthy growth of many local businesses depends on the trust and honesty displayed by our local businesses and merchants to the Village as a whole." *Id.* at 206. The Trustee subsequently stated publicly that he had made a list of local businesses at which he regularly shopped. His statements caused considerable consternation, and Chamber directors regarded the trustee's letter and statement as clearly threatening a boycott or other retaliatory action, such as discriminatory enforcement of Village regulations. *Id.* at 206, 210. The Second Circuit held that the district court had erred in granting summary judgment to the defendants, who included the Trustee, the Mayor and the Village, on the freedom-of-speech claim, because a reasonable factfinder could interpret the Trustee's statements as a veiled threat of boycott or other reprisal. *Id.* at 209–10. One judge dissented on the ground that the letter could not be interpreted as containing an implied threat. *Id.* at 211.

As noted earlier, Molinari did not have decisionmaking authority over billboards, just as Brezenoff did not have decisionmaking authority over the affairs of the department stores in *Hammerhead* and the legislators did not have such authority over the housing complex in *X–Men*. *Hammerhead* and *X–Men* emphasized the importance of this fact in finding that the First Amendment rights of the plaintiffs in those cases had not been violated. In *Rattner*, the Second Circuit apparently concluded that the evidence permitted an inference that the Trustee acted with the approval of the Mayor and other Village officials and that they had authority over the businesses in the Village that were members of the Chamber of Commerce. Also, as discussed above, Molinari's letter is not reasonably susceptible to interpretation as threatening economic harm. The letter called for a dialogue, not for responses to a detailed questionnaire that could reasonably be viewed as designed to intimidate. Furthermore, to the extent that *Rattner* distinguished *Hammerhead* because it was decided after a bench trial, the subsequent decision in *X–Men* strongly affirms that the district court has a duty to dismiss the complaint against a public official without direct authority over the plaintiffs who merely wrote critical letters and made statements that on their face are

not threatening or intimidating. In addition, *Rattner* did not decide whether the Village Trustee was entitled to exercise of his own First Amendment right of free speech because the district court had not ruled on it. *Id.* at 210. *X–Men* and *Connell* establish that public officials do have a right of expression under the First Amendment.

In sum, *X–Men*, decided after *Hammerhead* and *Rattner*, emphasized the duty of the court to dismiss a complaint promptly without subjecting a public official to the burdens of discovery and further litigation where the complaint does not state a claim of a civil rights violation. 196 F.3d at 65–67. In *X–Men*, the district court had allowed discovery to go forward and the Second Circuit reversed and ordered the complaint to be dismissed. Here, too, the Free Speech claim must be dismissed.[3]

## C. Establishment and Free Exercise Clause Claims

■ Plaintiffs claim that Molinari's letter constitutes an "official pronouncement" by government of hostility toward plaintiffs' religion and religious beliefs, in violation of the Establishment Clause of the First Amendment. They are mistaken. The letter on its face condemns the "intolerance" of the message on the billboards and its "unnecessarily confrontational and offensive nature." The letter expresses no hostility toward plaintiffs' religion or any other religion, nor does it express preference for one religion over another. In fact, Molinari did not even know the identity of the individual(s) or group, if a group existed, that was responsible for the billboard messages when he sent his letter. Instead, the letter furthers the government's neutral policy of opposing discrimination based on sexual orientation.

■ "[T]he First Amendment forbids an official purpose to disapprove of a particular religion or of religion in general." *Church of the Lukumi Babalu Aye, Inc. v. City, of Hialeah*, 508 U.S. 520, 532, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). While the Establishment Clause requires "wholesome 'neutrality' " by mandating that governmental action have a secular purpose and a primary effect that neither advances nor inhibits religion, *School Dist. of Abington Township v. Schempp*, 374 U.S. 203, 222, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), "it is not unconstitutional to criticize principles that happen to coincide with the religious teachings of certain groups." *Gheta v. Nassau Co. Comm. College*, 33 F.Supp.2d 179, 186 (E.D.N.Y.1999). Government dissemination of a message of tolerance of diverse views "is an entirely appropriate secular effect," and its mere consistency or inconsistency with the religious tenets of certain faiths is insufficient to constitute an unconstitutional establishment of religion. *Smith v. Board of School Comm'rs of Mobile Co.*, 827 F.2d 684, 692 (11th Cir.1987). Indeed, anti-discrimination laws "are well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination and they do not, as a general matter, violate the First or Fourteenth Amendments." *Hurley*, 515 U.S. at 572, 115 S.Ct. 2338 (discussing public accommodation law that prohibited discrimination on the basis of sexual orientation, among others). *See also Romer v. Evans*, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (invalidating on Equal Protection grounds a state

---

**3.** Since Molinari did not engage in conduct that violated plaintiffs' right to free speech under the First Amendment, it is unnecessary to decide whether PNE could be found liable to plaintiffs under Section 1983 for having acceded to coercion of government officials, as alleged.

constitutional amendment which withdrew from homosexuals, but not others, specific legal protection from discrimination).

Molinari, in urging tolerance consistently with local law and policy, did not engage in impermissible advancement or denigration of religion. The letter responds to the message, not the religious source of the message. As plaintiffs acknowledge, the billboards were deliberately erected to convey an anti-homosexual message, and they were placed where plaintiffs believe that a substantial number of members of the gay community and their supporters would be exposed to it. That plaintiffs used a quotation from the Bible to convey their message does not give it extra protection, or insulate it from criticism by public officials. Indeed, any such preference for a message by a religious group over one from an individual or group with no religious affiliation would itself violate the "wholesome neutrality" by government which the Establishment Clause requires. *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819, 841, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (government is required to remain neutral with regard to religious expression, whether "it manifests a religious view, an antireligious view, or neither").

Moreover, as *X–Men* affirmed, a public official's right of free speech is not subordinated to the right to associate for religious purposes. *X–Men*, 196 F.3d at 70. If the denunciations by the legislators in *X–Men* of individuals and an entity associated with the Nation of Islam as a "hate group" is constitutionally-protected speech, there is no basis for concluding that Molinari's statements were impermissible because they criticized plaintiffs' message. Nor is it significant that Molinari's letter specifically referred to the biblical source of the billboard message, stating: "I write regarding the recent appearance on two of your Staten Island billboards of four translations of Leviticus 18:22. As you are probably aware this particular biblical verse is commonly invoked as a biblical prohibition against homosexuality." Plaintiffs identified the biblical source of the quotes across their billboard message, and Molinari's reference to that fact cannot reasonably be interpreted as transforming his allowable commentary on plaintiffs' message into an impermissible display of official anti-religious animus. In criticizing a public message of intolerance of homosexuality, Molinari did not violate the Establishment Clause.

The Molinari letter also did not violate any right of the plaintiffs under the Free Exercise Clause of the First Amendment. The Free Exercise Clause secures religious liberty by prohibiting unnecessary restraints on it by government authority. "[I]t is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion." *Schempp*, 374 U.S. at 223, 83 S.Ct. 1560. The complaint does not allege any attempt by public officials to interfere with plaintiffs' observance of their religion, which they remain free to practice without hindrance.

Plaintiffs claim that Molinari interfered with their "right to proselytize", but this is simply another way of phrasing the Free Speech Clause claim, and is rejected for the same reasons. *See also Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 652–53, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) (Free Exercise Clause did not give to members of a religious sect which made solicitation part of its ritual a special claim of right to unrestricted solicitation and distribution of literature at a fairground that was not conferred by the First Amendment upon other religions or "other organizations

having social, political, or other ideological messages to proselytize"). Molinari does not challenge plaintiffs' right to spread their message. He argues instead that his letter was a constitutionally-protected response to plaintiffs' message and that it was not coercive in a manner that might transform PNE's decision to remove the billboards from private activity into state action in violation of the First Amendment. The right to free exercise of religion does not include the right to be free from criticism of viewpoints that happen to be espoused by that religion. *Cf.* cases discussed above, at pp. 18–19, regarding a similar claim under the Establishment Clause.

## D. Equal Protection Claim

█ Plaintiffs' equal protection claim under Section 1983 rests upon the assertion "that they were treated dissimilarly from others on the basis of the viewpoint expressed in their message." (Pl.Br. at 18). The complaint alleges that plaintiffs and others who publicly expressed a viewpoint against homosexuality were treated differently from persons or groups who publicly expressed a viewpoint in favor of homosexuality. The alleged difference in treatment consists of Molinari's "official policy pronouncement" of disapproval of public speakers who oppose homosexuality, and the removal of plaintiffs' signs. These allegations do not state a claim of violation of plaintiffs' rights under the Equal Protection Clause. "[A]s for X–Men's equal protection claims against the legislators, who are sued not for actions but rather for their speech, there simply is no equal protection right not to be singled out for criticism." *X–Men*, 196 F.3d at 72. Molinari, too, is sued for his speech, and, as found earlier, the complaint does not state a claim that Molinari engaged in coercive action that is unprotected by the right of public officials to express their views and those of their constituents on matters of public concern.

## E. Claims Under Sections 1985(3) and 1986

█ To state a claim under Section 1985(3), a plaintiff must allege: (1) a conspiracy, (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the law; (3) an overt act in furtherance of the conspiracy; and (4) an injury to plaintiff's person or property, or deprivation of a right or privilege of citizenship. Furthermore, the conspiracy must be motivated by class-based, invidiously discriminatory animus. *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999). The Second Circuit has held that discrimination on the basis of religion can satisfy the requirement of a class-based, invidiously discriminatory animus. *LeBlanc–Sternberg v. Fletcher*, 67 F.3d 412, 426–27 (2d Cir.1995), *cert. denied*, 518 U.S. 1017, 116 S.Ct. 2546, 135 L.Ed.2d 1067 (1996). However, proof that defendants were motivated by hostility to plaintiffs' religion is required. *Id.*, citing *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269–70, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993) (goal of preventing abortion does not qualify as an invidiously discriminatory animus directed at women in general and therefore cannot form the basis of a conspiracy charge under § 1985(3)). "Whatever may be the precise meaning of 'class' for purposes of [§ 1985(3) ], the term unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors." *Bray*, 506 U.S. at 269, 113 S.Ct. 753. Just as the Supreme Court in *Bray* held that opposition to abortion could not be equated with animus against women by reason of their sex, Molinari's opposition to

intolerance based on sexual orientation cannot be equated with animus against religion. His comments were not aimed at religion; they were directed at plaintiffs' message, not its religious source, and the complaint contains no non-conclusory allegations that suggest that Molinari was motivated by hostility to any particular religion or to religion in general. Therefore, no claim under § 1985(3) is stated.

The complaint also fails to state a claim under Section 1985(3) because, as plaintiffs' counsel clarified at oral argument, it is based on the proposition that Molinari conspired with members of his staff, not with PNE. The claim is invalid under the "intracorporate conspiracy doctrine," pursuant to which "officers, agents, and employees of a single corporate entity, each acting within the scope of her employment, are legally incapable of conspiring together." *Salgado v. City of New York*, 2001 WL 290051, at *8 (S.D.N.Y., Mar.26, 2001) (applying principle to dismiss § 1985(3) claim where all defendants were officers, agents and employees of City of New York); *Bond v. Board of Educ.*, 1999 WL 151702 (E.D.N.Y.1999) (dismissing § 1985(3) claim where all defendants were officers or employees of the City Board of Education acting within the scope of their employment).

Since no claim under Section 1985(3) is stated, the derivative claim under Section 1986 against PNE also falls. "[A] § 1986 claim must be predicated upon a valid § 1985 claim." *Thomas*, 165 F.3d at 147.[4]

## CONCLUSION

The motions of defendants Guy V. Molinari and PNE Media, LLC to dismiss the federal claims against them for failure to state claims is granted. The court de-

clines to exercise supplemental jurisdiction over the state law claims, which are dismissed without prejudice. Plaintiffs' motion to strike is denied.

**SO ORDERED.**

---

4. Plaintiffs' motion to strike the Declaration of Dana Biberman, attorney for defendant Molinari in this action, is denied. The docu-

ment does not refer improperly to any material that is not included in the complaint.