**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CATHOLIC LEAGUE FOR
RELIGIOUS AND CIVIL RIGHTS;
RICHARD SONNENSHEIN; VALERIE
MEEHAN,

　　　　　*Plaintiffs-Appellants,*

　　　　　　　v.

CITY AND COUNTY OF SAN
FRANCISCO; AARON PESKIN; TOM
AMMIANO in his official capacity as
a Supervisor, Board of
Supervisors, City and County of
San Francisco,

　　　　　*Defendants-Appellees.*

No. 06-17328

D.C. No.
CV-06-02351-MHP

OPINION

Appeal from the United States District Court
for the Northern District of California
Marilyn H. Patel, District Judge, Presiding

Argued and Submitted
July 18, 2008—San Francisco, California

Filed June 3, 2009

Before: Procter Hug, Jr., Richard A. Paez, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Paez;
Concurrence by Judge Berzon

## COUNSEL

Robert J. Muise, Thomas More Law Center, Ann Arbor, Michigan, for the appellants.

Vince Chhabria, City Attorney's Office of San Francisco, San Francisco, California, for the appellees.

## OPINION

PAEZ, Circuit Judge:

Appellants, Catholic League for Religious and Civil Rights, Dr. Richard Sonnenshein, and Valerie Meehan (collectively, "Catholic League" or "the League"), appeal the dismissal of their civil rights action under 42 U.S.C. § 1983 for failure to state a claim. At issue is the constitutionality of a non-binding resolution adopted by the Board of Supervisors of the City and County of San Francisco ("the Board") concerning the adoption of children by same-sex couples and the Catholic Church's position against such adoptions. Catholic League argues that in adopting the resolution the Board expressed disapproval of the Catholic religion in violation of the First Amendment's Establishment Clause. Because we conclude that the resolution passes constitutional scrutiny, we affirm.[1]

## I.

In March, 2006, the Board passed a non-binding resolution, Res. No. 168-06, titled: "Resolution urging Cardinal Levada to withdraw his directive to Catholic Charities forbidding the placement of children in need of adoption with same-sex couples." ("Resolution"). The Resolution provides in full:

> **Resolution urging Cardinal William Levada, in his capacity as head of the Congregation for the Doctrine of the Faith at the Vatican, to withdraw his discriminatory and defamatory directive that Catholic Charities of the Archdiocese of San Francisco stop placing children in need of adoption with homosexual households**.
>
> WHEREAS, It is an insult to all San Franciscans when a foreign country, like the Vatican, meddles

---

[1]We have jurisdiction under 28 U.S.C. § 1291.

with and attempts to negatively influence this great City's existing and established customs and traditions such as the right of same-sex couples to adopt and care for children in need; and

WHEREAS, The statements of Cardinal Levada and the Vatican that "Catholic agencies should not place children for adoption in homosexual households," and "Allowing children to be adopted by persons living in such unions would actually mean doing violence to these children" are absolutely unacceptable to the citizenry of San Francisco; and

WHEREAS, Such hateful and discriminatory rhetoric is both insulting and callous, and shows a level of insensitivity and ignorance which has seldom been encountered by this Board of Supervisors; and

WHEREAS, Same-sex couples are just as qualified to be parents as are heterosexual couples; and

WHEREAS, Cardinal Levada is a decidedly unqualified representative of his former home city, and of the people of San Francisco and the values they hold dear; and

WHEREAS, The Board of Supervisors urges Archbishop Niederauer and the Catholic Charities of the Archdiocese of San Francisco to defy all discriminatory directives of Cardinal Levada; now, therefore, be it

RESOLVED, That the Board of Supervisors urges Cardinal William Levada, in his capacity as head of the Congregation for the Doctrine of the Faith at the Vatican (formerly known as Holy Office of the Inquisition), to withdraw his discriminatory and defamatory directive that Catholic Charities of the

> Archdiocese of San Francisco stop placing children
> in need of adoption with homosexual households.

The Board passed this resolution in response to a then-recent directive from Prefect Cardinal William Levada, instructing the Archdiocese of San Francisco that Catholic social services agencies should not place children in need of adoption with gay or lesbian couples.[2] Cardinal Levada is the head of the Congregation for the Doctrine of the Faith—an official body within the Catholic Church that, according to the complaint, is charged with "promot[ing] and safeguard[ing] the doctrine on the faith and morals throughout the Catholic world." The Resolution also quotes a statement in a 2003 document issued by the Congregation, titled "Considerations Regarding Proposals to Give Legal Recognition to Unions Between Homosexual Persons" ("Considerations document"). The Resolution does not name or specifically refer to the Considerations document, but the League alleges that the language "Allowing children to be adopted by persons living in [homosexual] unions would actually mean doing violence to these children" is taken from the 2003 document.

Shortly after the Board adopted the Resolution, Catholic League filed a 42 U.S.C. § 1983 suit in the Northern District of California, alleging that the Resolution violates the Establishment Clause by expressing disapproval of and hostility towards the Catholic Church and Catholic religious tenets. Catholic League sought "nominal damages, a declaration that this anti-Catholic resolution is unconstitutional, and a permanent injunction enjoining this and other official resolutions, pronouncements, or declarations against Catholics and their religious beliefs."

The Defendants-Appellees[3] filed a Federal Rule of Civil

---

[2] Cardinal Levada's communique is not part of the record in this case.

[3] The Defendants-Appellees include the City and County of San Francisco; Aaron Peskin, in his official capacity as President, Board of Supervisors, City and County of San Francisco; and Tom Ammiano, in his official capacity as a Supervisor, Board of Supervisors, City and County of San Francisco.

Procedure 12(b)(6) motion to dismiss, which the district court granted in a thorough and well-reasoned decision. Applying the three-part *Lemon* test, the district court determined that the Resolution did not have a purpose secondary to a predominant religious purpose nor a primary effect of expressing hostility towards the Catholic religion and that the resolution did not foster excessive government entanglement with religion. *See Lemon v. Kurtzman*, 403 U.S. 602 (1971); *Catholic League v. City and County of San Francisco*, 464 F. Supp. 2d 938 (N.D. Cal. 2006). As a result, the court concluded that Catholic League failed to state a claim under § 1983 for violation of the Establishment Clause and dismissed the complaint. Catholic League timely appealed.

## II.

We review de novo a dismissal for failure to state a claim under Rule 12(b)(6). *Vasquez v. Los Angeles County*, 487 F.3d 1246, 1249 (9th Cir. 2007). In addressing cases in this posture, we must accept the allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. However, " 'conclusory allegations of law and unwarranted inferences' will not defeat an otherwise proper motion to dismiss." *Id.* (quoting *Schmier v. U.S. Court of Appeals for the Ninth Circuit*, 279 F.3d 817, 820 (9th Cir. 2002)).

## III.

**[1]** "[T]he 'First Amendment mandates governmental neutrality between religion and religion and between religion and nonreligion.' " *McCreary County v. ACLU*, 545 U.S. 844, 860 (2005) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)). This constitutional mandate requires careful and nuanced consideration in a society like ours where religion has long played a pervasive social role; government conduct towards religion "must be judged in its unique circumstances to determine whether it constitutes an endorsement or disap-

proval of religion." *Lynch v. Donnelly*, 465 U.S. 668, 694 (1984) (O'Connor, J., concurring).

**[2]** We apply the three-part *Lemon* test to determine whether government conduct—either through endorsement of religion or hostility towards it—violates the Establishment Clause. Government action will pass muster if it "(1) has a secular purpose; (2) has a principal or primary effect that neither advances nor disapproves of religion; and (3) does not foster excessive governmental entanglement with religion." *Vasquez*, 487 F.3d at 1255 (citing *Lemon,* 403 U.S. at 612-13). Failure to satisfy any of these three inquiries condemns government conduct as unconstitutional.

**[3]** Although the courts have not often had occasion to determine whether government action effects a *disapproval* of religion, as opposed to an endorsement, the Establishment Clause's neutrality mandate applies here with equal force. We are guided in our analysis by *American Family Association*, one of only a handful of disapproval cases, which dealt with another set of resolutions adopted by the San Francisco Board of Supervisors. *American Family Association* treated disapproval and endorsement as flip-sides of the same coin—the same legal tests and underlying First Amendment values apply. We phrased the applicable principle in several ways—the state may not disapprove of religion, express hostility towards religion, nor inhibit religion, *American Family Ass'n*, 277 F.3d at 1121, 1122[4] —and used the three terms interchangeably.

---

[4]The disapproval language appears to come from *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993), a Free Exercise Clause case; the inhibit language is drawn from *Lemon*, *see Lemon*, 403 U.S. at 612, and its predecessors, including *School Dist. of Abington Tp. v. Schempp*, 374 U.S. 203, 222 (1963).

**A.**

The first step in the *Lemon* analysis is to discern the government's actual purpose in taking the challenged action—in this case, adopting the Resolution. A "predominantly religious purpose" violates the Establishment Clause. *McCreary County*, 545 U.S. at 881. Government action, however, satisfies the purpose prong if it is "grounded in a secular purpose." *Vasquez*, 487 F.3d at 1255. Furthermore, "[a] legislature's stated reasons will generally get deference, [but] the secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective." *McCreary County*, 545 U.S. at 864.

Catholic League argues that it is evident from the face of the Resolution that the City's predominant purpose was to attack Catholic religious beliefs. The League points to the resolution's harsh and forceful language as betraying the Board's true intentions: "discriminatory," "defamatory," "absolutely unacceptable," "hateful and discriminatory," "insulting and callous," and "show[ing] a level of insensitivity and ignorance which has seldom been encountered." The Board counters that, despite the inflammatory language, it passed the resolution for secular purposes.[5]

---

[5]Our earlier cases held that even one secular purpose out of several was sufficient. That is, government action failed "the purpose prong 'only if it [was] motivated *wholly* by an impermissible purpose.'" *American Family Ass'n v. City and County of San Francisco*, 277 F.3d 1114, 1121 (9th Cir. 2002) (quoting *Kreisner v. City of San Diego*, 1 F.3d 775, 782 (9th Cir. 1993). *But see Vernon v. City of Los Angeles*, 27 F.3d 1385, 1397 (9th Cir. 1994) ("[W]e believe that the Supreme Court has articulated a slightly more stringent test, which requires that the 'actual' or 'primary' purpose of the government action be secular."). *McCreary County* clarifies, however, that the inquiry is whether the government acted with a "predominantly" religious purpose. *See McCreary County*, 545 U.S. at 862 ("predominantly religious purpose"); *id.* at 863 ("predominant purpose of advancing religion"); *id.* at 881 ("predominantly religious purpose"); *id.* at 864 (secular purpose cannot be "merely secondary to a religious objective").

**[4]** As we explained in *American Family Association*, we do not question whether the Board's actions were wise; "rather we determine the constitutionality of those actions." *American Family Ass'n*, 277 F.3d at 1122. *See also Brown v. Woodland Joint Unified School District*, 27 F.3d 1373, 1382 (9th Cir. 1994) ("[O]nce the state is free to use a secular means of attaining a goal, it is not required to use an alternative secular means that is less likely to be associated with religion."). To be sure, the Board could have spoken with a gentler tone, but the strength of the Board's language alone does not transform a secular purpose into a religious one. The constitutional question remains whether the Board's purpose in adopting the Resolution was secular in nature. In other words, we must first decide whether the Board's purpose in criticizing the Cardinal's directive was disapproval of religious doctrine, or a call for non-discrimination in the adoption of children, and second whether for Establishment Clause purposes there is a difference between the two.[6]

"The eyes that look to purpose belong to an 'objective observer.' " *McCreary County*, 545 U.S. at 862 (quoting *Santa Fe Independent School Dist. v. Doe*, 530 U.S. 290, 308 (2000)). The objective observer is "one presumed to be familiar with the history of the government's actions and competent to learn what history has to show." *Id.* at 866. In so describing the objective observer, the Supreme Court has instructed that we cannot "cut the context" out of the purpose inquiry. *Id.* at 864. Examining the Board's resolution in context, the district court correctly concluded that the objective observer would ascertain a secular purpose behind the Board's adoption of the non-binding Resolution.[7]

---

[6]We revisit the Resolution's tone in the effects analysis, where the choice of language may have a different impact.

[7]Although the purpose test has always called on us to discern the government's actual purpose, *see American Family Ass'n*, 277 F.3d at 1121; *Kreisner*, 1 F.3d at 782, *McCreary County* recently sharpened the inquiry. The Court announced that purpose must be evaluated from the perspective

**[5]** The Board argues that its predominant purpose in adopting the Resolution was to "denounce discrimination against same-sex couples, and to try to preserve for San Francisco children the opportunity to be placed for adoption with qualified families without regard to sexual orientation." That purpose is set out by both the title and preamble of the Resolution. Indeed, the title states: "Resolution urging Cardinal Levada to withdraw his directive to Catholic Charities forbidding the placement of children in need of adoption with same-sex couples." And to emphasize, the preamble declares: "Resolution urging Cardinal William Levada, in his capacity as head of the Congregation for the Doctrine of the Faith at the Vatican, to withdraw his discriminatory and defamatory directive that Catholic Charities of the Archdiocese of San Francisco stop placing children in need of adoption with homosexual households." This theme is born out in the opening paragraph, which places the Resolution in the context of San Francisco's "existing and established customs and traditions such as the right of same-sex couples to adopt and care for children in need," and continues throughout the text,

---

of an objective observer. The Second Circuit has suggested that after *McCreary County* the courts must now engage in two distinct inquires—one to assess the government's "actual" purpose, and another to ask how "the government's purpose is perceived by an objective observer." *Skoros v. City of New York*, 437 F.3d 1, 22 (2d Cir. 2006 ) (internal quotations omitted). We do not read *McCreary County* as adopting a two part inquiry for evaluating government purpose. By adopting an objective test, the Court dismissed the petitioners' assertion that "true 'purpose' is unknowable, and its search [is] merely an excuse for courts to act selectively and unpredictably in picking out evidence of subjective intent." *McCreary County*, 545 U.S. at 861. As the Court explained, the purpose inquiry is not an invitation to courts to cherry pick; instead, "scrutinizing purpose does make practical sense, as in Establishment Clause analysis, where an understanding of official objective emerges from readily discoverable fact, without any judicial psychoanalysis of a drafter's heart of hearts." *Id.* at 862. Toward that end the Court noted that "[t]he eyes that look to purpose belong to an 'objective observer.' " *Id.* In other words, we use the objective observer—one who takes account of history and context—to discern the government's "actual" purpose.

which explains that "[s]ame-sex couples are just as qualified to be parents as are heterosexual couples." It is apparent that the Resolution is about non-discrimination in adoption.

In addition, the timing of the Resolution lends further context and supports the Board's asserted purpose. *See McCreary County*, 545 U.S. at 866 (quoting *Santa Fe*, 530 U.S. at 315) ("[R]easonable observers have reasonable memories, and our precedents sensibly forbid an observer 'to turn a blind eye to the context in which [the] policy arose.' " (quoting *Santa Fe*, 530 U.S. at 315)). The Congregation for the Doctrine of the Faith issued its clarion call against legalization of gay and lesbian unions, as an exposition of religious belief, in 2003. It was not until March 2006, days after Cardinal Levada directed Catholic Charities, a social services agency in the City of San Francisco, to stop placing children for adoption with gay and lesbians couples, that the Board adopted this resolution. Keeping in mind the context in which the Resolution arose, the objective observer would conclude that the Board's purpose in adopting the Resolution was to respond to a public action that would affect both its gay and lesbian constituents, as well as the children in the City and County's jurisdiction. The Board's focus was on same-sex couples, not Catholics.

**[6]** Moreover, "[a] reviewing court must be 'reluctant to attribute unconstitutional motives' to government actors in the face of a plausible secular purpose." *Kreisner*, 1 F.3d at 782 (quoting *Mueller v. Allen*, 463 U.S. 388, 394-95 (1983)). In light of this proscription, and the Resolution's focus on and stated goal of protecting and promoting adoption by same-sex couples, an objective observer would conclude that the Board's purpose was to champion needy children, gays, lesbians, and same-sex couples within its jurisdiction; not to officially disapprove of the Catholic faith or its religious tenets.

Catholic League maintains, however, that this is a distinction without a difference. It argues that the Board's support for same-sex adoption, and its basic underlying assumption

that same-sex couples should be treated no differently than heterosexual couples—and that anything less is discriminatory, defamatory, and hateful—expresses hostility toward their *religious* beliefs that homosexuality is "deviant," and "intrinsically disordered," homosexual acts are "acts of grave depravity," homosexual unions are "clearly . . . immoral," and "[a]llowing children to be adopted by persons living in such unions would actually mean doing violence to these children."

As the district court noted, same-sex adoption is "a secular dimension of the City's culture and tradition that the City believes is threatened by the specific directive issued to the Archdiocese." *Catholic League*, 464 F. Supp. 2d at 944. The Board considers its Resolution as a secular message promoting same-sex adoption—a message that is in accord with a bevy of California and San Francisco laws and policies that promote equal rights for gays and lesbians and their families, *see In re Marriage Cases*, 43 Cal. 4th 757 (2008) (documenting the City and County of San Francisco's involvement as a plaintiff in the litigation to legalize same-sex marriage); *Lockyer v. City and County of San Francisco*, 33 Cal. 4th 1055 (2004) (holding that City and County officials lacked the authority to issue marriage licenses to same-sex couples, a practice they adopted at the Mayor's direction); SF Admin. Code § 62.1 (officially recognizing domestic partnerships); SF Admin. Code § 12B1 (preventing entities that contract with the City from discriminating on the basis of sexual orientation, domestic partner status, or marital status), and resolutions that denounce discrimination against gays and lesbians from all sources, *see infra* pp.6599-6600 (listing San Francisco Board of Supervisors non-binding resolutions). To put it plainly, what the Board considers secular, Catholic League considers hostile to Catholic religious tenets.

**[7]** This dual characterization is not uncommon. Courts have long recognized that certain secular beliefs, views, and positions coincide with religious beliefs, views, and positions. In such cases, government speech or action with respect to a

secular issue is not considered endorsement of religion simply because the government's views are consistent with religious tenets. That is, the same belief can have both religious and secular dimensions; the government is not stripped of its secular purpose simply because the same concept can be construed as religious. *See McGowan v. Maryland*, 366 U.S. 420, 442 (1961) ("[T]he 'Establishment' Clause does not ban federal or state regulation of conduct whose reason or effect merely happens to coincide or harmonize with the tenets of some or all religions. In many instances, the Congress or state legislatures conclude that the general welfare of society, wholly apart from any religious considerations, demands such regulation . . . . [T]he fact that [a policy] agrees with the dictates of the Judaeo Christian religions while it may disagree with others does not invalidate the regulation."); *Bowen v. Kendrick*, 487 U.S. 589, 612-13 (1988) ("On an issue as sensitive and important as teenage sexuality, it is not surprising that the Government's secular concerns would either coincide or conflict with those of religious institutions. But the possibility or even the likelihood that some of the religious institutions who receive Adolescent Family Life Act funding will agree with the message that Congress intended to deliver . . . is insufficient to warrant a finding that the statute on its face has the primary effect of advancing religion."); *id.* at 605 (noting that "promot[ing] adoption as an alternative [for adolescent parents]" is an approach that is not "inherently religious, although it may coincide with the approach taken by certain religions."); *Brown*, 27 F.3d at 1381 (" '[M]ere consistency with religious tenets is insufficient to constitute unconstitutional advancement of religion.' " (quoting *Smith v. Bd. of Sch. Comm'rs of Mobile County*, 827 F.2d 684, 692 (11th Cir. 1987))).[8] In sum,

_____

[8]*See also Okwedy v. Molinari*, 150 F. Supp. 2d 508, 519-20 (E.D.N.Y. 2001) (rev'd in part *Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003)) ("Government dissemination of a message of tolerance of diverse views 'is an entirely appropriate secular effect,' and its mere consistency or inconsistency with the religious tenets of certain faiths is insufficient to constitute an unconstitutional establishment of religion. . . . In criticizing

if consistency with religious beliefs is not endorsement of religion, inconsistency is not hostility to it.

Our opinion in *American Family Association* is particularly instructive. In 1998, several religious groups sponsored a multimedia advertising campaign titled "Truth in Love." *American Family Ass'n*, 277 F.3d at 1118. The advertisement, printed in the San Francisco Chronicle, stated that "God abhors any form of sexual sin," including homosexuality, and claimed that Jesus Christ could help gays and lesbians "walk[ ] out of homosexuality into sexual celibacy." *Id*. at 1119. The ad also included "statistics" about homosexuality, sexually transmitted infections, and "destructive behavior." *Id*.

In response to the ad campaign, the San Francisco Board of Supervisors sent a letter to the plaintiffs (among other campaign sponsors), stating that "Supervisor Leslie Katz denounces your hateful rhetoric against gays, lesbians and transgendered people," and that "there is a direct correlation between these acts of discrimination, such as when gays and lesbians are called sinful and when major religious organizations say they can change if they tried, and the horrible crimes committed against gays and lesbians," such as the brutal murder of Matthew Shepard. *Id*. The Board then adopted two resolutions—one urging Alabama legislators to include sexual orientation in their hate crimes legislation, and calling on the "Religious Right to take accountability for the impact of their long-standing rhetoric denouncing gays and lesbians," *id*.; the other addressing the advertisements. The second resolution called the ad's statistical assertions "erroneous and full of

---

a public message of intolerance of homosexuality, Molinari did not violate the Establishment Clause." (quoting *Smith*, 877 F.2d at 692)); *Gheta v. Nassau Co. Comm. College*, 33 F. Supp. 2d 179, 186 (E.D.N.Y. 1999) ("[I]t is not unconstitutional to criticize principles that happen to coincide with the religious teachings of certain groups.").

lies," and stated that the campaign encouraged maltreatment of and violence against gays and lesbians. *Id.* at 1120.

**[8]** The plaintiffs, religious organizations, filed a § 1983 action against the Board, claiming that the letter and resolutions violated the Establishment Clause by disapproving of a "particular religion." *Id.* On appeal we concluded that the defendants' actions had a plausible secular purpose and the primary effect of the documents in question was "encouraging equal rights for gays and discouraging hate crimes," *id.* at 1121-23, not hostility "towards the *religious* view that homosexuality is sinful or immoral," *id.* at 1122 (emphasis added). We recognized the dual nature of views on homosexuality, and determined that San Francisco should not be hamstrung in its public policy simply because its secular position was at odds with certain religious views; that some perspectives on gay and lesbian issues are rooted in religious belief cannot overwhelm the fact that gay and lesbian issues are also secular policy matters. Any other approach would stymie government's ability to take action on all "potentially religious issues, including abortion, alcohol use, [and] other sexual issues." *Id.* at 1123. That is simply not the purpose or function of the Establishment Clause. The government must maintain neutrality among religions and between religion and non-religion, but it cannot be held hostage to it. It is well within the Board's secular purview to promote adoptions of children by same-sex couples and denounce discrimination for the "general welfare of society." *McGowan*, 366 U.S. at 442.

## B.

**[9]** Although the Board's purpose was secular, the resolution may still violate the Establishment Clause if it "has the principal or primary effect of advancing or inhibiting religion." *American Family Ass'n*, 277 F.3d at 1122. To ascertain effect, we ask whether "it would be objectively reasonable for the government action to be construed as sending primarily a message of either endorsement or disapproval of religion."

*Vernon v. City of Los Angeles*, 27 F.3d 1385, 1398 (9th Cir. 1994). This inquiry is conducted "from the perspective of a 'reasonable observer' who is both informed and reasonable," *American Family Ass'n*, 277 F.3d at 1122 (quoting *Kreisner*, 1 F.3d at 784), and who is "familiar with the history of the government practice at issue." *Kreisner*, 1 F.3d at 784.[9]

[10] As discussed above, the Board's unequivocal promotion of non-discrimination against same-sex couples in adoption is secular, regardless of whether the Catholic Church may be opposed to it as a religious tenet. The question is whether promotion of same-sex adoption is reasonably understood as the *primary* message conveyed by the Resolution.[10] It is not enough that one might " 'infer' " disapproval of Catholic religious tenets; rather, disapproval or inhibition must " 'objectively be construed as the primary focus or effect.' "

---

[9]We previously encountered this observer in our purpose inquiry. Post-*McCreary County* we turn to the objective observer to assess both purpose and effect. The question arises whether these inquiries have substantially merged. In both instances, the objective observer takes context and history into consideration, ensuring that he addresses both questions from the same nuanced, contextualized perspective. Two differences remain, however. First, whereas in the purpose inquiry, we are " 'reluctant to attribute unconstitutional motives' to government actors in the face of a plausible secular purpose." *Kreisner*, 1 F.3d at 782 (quoting *Mueller v. Allen*, 463 U.S. 388, 394-95 (1983)), no such presumption applies in the effects analysis. Moreover, the objective observer must be presumed to understand the difference between what the government intends and what it produces. The purpose prong asks what message the government *meant* to convey, while the effects prong asks what message the government *actually* conveyed. *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring). Given the salience of San Francisco's history of gay and lesbian advocacy to each inquiry, the two questions are closely related here.

[10]As an initial matter, we note that it is not immediately obvious that a non-binding resolution has any "effects." By definition, it imposes no regulation or obligation. Establishment Clause cases, however, regularly turn on symbolism. Just as a holiday display can convey a message, so too a non-binding resolution.

*American Family Ass'n*, 277 F.3d at 1122 (quoting *Vernon*, 27 F.3d at 1398-99).[11]

**[11]** The primary message conveyed by the Resolution turns in large part on the scope of the lens through which we view it. We believe that a sufficiently broad lens is essential. We must read the Resolution "as a whole," *American Family Ass'n*, 277 F.3d at 1122; its message can be affected by its context and must be analyzed given its "unique circumstances." *Lynch*, 465 U.S. at 694 (O'Connor, J., concurring). To be sure, there are statements in the Resolution that, taken in isolation, may be said to convey disparagement towards the Catholic Church. But to be violative of the Establishment Clause, those statements must overwhelm the Resolution's secular dimensions. Considering the Resolution as a whole, with its focus on the City's tradition of promoting and defending same-sex relationships, they do not.

**[12]** Again, Catholic League argues that the Board's harsh language conveys a message of disapproval. As we explained above, generally, the Resolution's strong language speaks to its secular message: "denounc[ing] discrimination against same-sex couples" and supporting adoption by such couples of children in need. The Resolution, however, also targets the statement, attributed to Cardinal Levada and the Vatican that "Allowing children to be adopted by persons living in such

---

[11]Catholic League argues that if the Resolution conveys *any* message of hostility towards the Catholic religion—be it secondary, tertiary, or otherwise—the Resolution fails the *Lemon* test, and the district court erred as a matter of law in concluding that the Board's *primary* purpose is dispositive. Catholic League's argument is unavailing. Our precedents make clear that we treat inhibition no differently than advancement; we are tasked with determining whether the *primary* effect of the challenged government action endorses or disapproves of religion or a religion. *See, e.g.*, *American Family Ass'n*, 277 F.3d at 1122 ("[T]he focus of this prong is on the *primary* effect of the government's conduct.") (emphasis in original); *Vernon*, 27 F.3d at 1398 ("[T]he key consideration in this second prong analysis is whether the government action 'primarily' disapproves of religious beliefs.").

unions would actually mean doing violence to these children," and calls it, among other things "absolutely unacceptable to the citizenry of San Francisco." That statement comes from the Considerations document, which the complaint explains is an exposition of Catholic religious tenets. Standing alone, therefore, an objective observer might conclude that the Board was expressing disapproval of Catholic religious belief, rather than endorsing a secular position. But the statement does not stand alone. It is embedded in the larger Resolution which is primarily a defense of same-sex adoption. That one statement cannot fairly be said to embody the Resolution's primary message.

[13] The Resolution also urges "Archbishop Niederauer and the Catholic Charities of the Archdiocese of San Francisco to defy all discriminatory directives of Cardinal Levada," and urges "Cardinal William Levada, in his capacity as head of the Congregation for the Doctrine of the Faith at the Vatican (formerly known as Holy Office of the Inquisition), to withdraw his discriminatory and defamatory directive." Catholic League argues that those statements express disapproval of religion/Catholicism, and that they are not incidental to the primary message, but rather they define the message. We agree with the district court's observation that "[t]he fact that the City was commenting on the policy of the Archdiocese in this regard does not violate the Establishment Clause simply because the secular activity [i.e. adoption] was being performed by a religious organization." *Catholic League*, 464 F. Supp. 2d at 945 (citing *Bowen*, 487 U.S. at 613).[12] In any event, however, given the Resolution's primary message of promoting same-sex adoption, any hostility conveyed towards

---

[12]To be clear, we do not distinguish between religious beliefs and implementation of those beliefs. The directive, as far as the Catholic Church is concerned, may very well be just as "religious" as statements of belief in the Considerations document. The Board's statements with respect to the directive may nonetheless be secular and convey a message of non-discrimination in adoption.

particular Catholic tenets by those statements was secondary at best.

The Board's extensive and persistent practice of passing non-binding resolutions denouncing discrimination against gays and lesbians also shapes the message the Resolution conveys. The Board's secular defense of same-sex couples in all aspects of life is the dominant theme of the Board's actions. *See* Resolution No. 73-05[13] ("Resolution urging the Supreme Court of the United States to rescind their refusal and to accept the hearing of a legal challenge to Florida's prohibition of adoption of children by gays and lesbians"); Resolution No. 129-06 ("Resolution urging the IRS to reconsider their ruling on Domestic Partners and Community Property"); Resolution No. 166-06 ("Resolution urging Governor Schwarzenegger to submit amicus brief to New York Supreme Court of Appeals in support of the right of same-sex civil marriage"); Resolution No. 364-06 ("Resolution condemning the government sanctioned violence and chaos which took place during Moscow's first Gay Pride march"); Resolution No. 127-05 ("Resolution urging . . . Secretary of Education to publicly apologize to gay, lesbian, bisexual, and transgender community"); Resolution No. 454-05 ("Resolution condemning the offensive and discriminatory training video shown to San Francisco 49er players"); Resolution No. 308-03 ("Resolution urging Senator Rick Santorum to step down from his leadership position in the Republican Party and to apologize for his comments [comparing homosexuality to polygamy, incest, and adultery]"); Resolution No. 199-00 ("Resolution urging Dr. Laura Schlessinger to refrain from making inaccurate statements about gays and lesbians that incite violence and hate"); *see also American Family Ass'n*,

---

[13]The district court took judicial notice of these resolutions as matters of public record, *see Catholic League*, 464 F. Supp. 2d at 941, as do we. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) ("[A] court may take judicial notice of matters of public record" (internal quotation omitted)).

277 F.3d at 1119-23 (concluding that a letter and two resolutions by the San Francisco Board of Supervisors criticizing religious groups for denouncing homosexuality did not violate the Establishment Clause).

**[14]** Just as the "overall holiday setting" can change the message conveyed by a crèche, and a "typical museum setting, though not neutralizing the religious content of a religious painting, negates any message of endorsement of that content," *Lynch*, 465 U.S. at 692 (O'Connor, J., concurring), the Board's well-established practice of responding whenever the equality of gay and lesbian families is called into question necessarily colors the message conveyed by the Resolution. In adopting the Resolution, consistent with past practice, the Board sought to champion same-sex families and non-discrimination as to gays and lesbians. An objective observer would understand as much.

## C.

**[15]** Last, we consider whether government action "foster[s] excessive governmental entanglement with religion." *Vasquez*, 487 F.3d at 1255. "Administrative entanglement typically involves comprehensive, discriminating, and continuing state surveillance of religion." *Vernon*, 27 F.3d at 1399. Entanglement in the form of "political divisiveness," that is, government actions that cause the public to fracture along religious lines, " 'has never been relied upon as an independent ground for holding a government practice unconstitutional.' " *American Family Ass'n*, 277 F.3d at 1123 (quoting *Brown*, 27 F.3d at 1383).

Catholic League's primary argument is that the resolution fosters excessive entanglement by taking "an official position on religious doctrine," and that the Board has attempted to "improperly influence Church authority and meddle in Church affairs." The case cited by Catholic League, *Commack Self-Service Kosher Meats, Inc. v. Weiss*, 294 F.3d 415 (2d

Cir. 2002), simply does not support its argument that the Board's non-binding Resolution fosters excessive entanglement.

*Commack* held that New York's statutes prohibiting fraud in the sale of kosher food violated the Establishment Clause by fostering excessive entanglement. *Id.* at 425. The Second Circuit concluded that the laws "excessively entangle government and religion because they (1) take sides in a religious matter, effectively discriminating in favor of the Orthodox Hebrew view of dietary requirements; [and] (2) require the State to take an official position on religious doctrine . . . ." *Id.*

**[16]** The laws challenged in *Commack* are different in kind than the Board's Resolution here. New York's kosher fraud laws took sides in a religious matter in that they took one definition of kosher, codified it, and regulated it, to the exclusion of other competing doctrines of kashrut within Judaism.[14] *See id.* at 426. The laws took an official position on religious doctrine because determining whether each food article met kashrut's requirements, the State had to "either interpret religious doctrine or defer to the interpretations of religious officials." *Id.* at 427. By contrast, the Board's Resolution did not codify one strain of Catholic belief. It did not "take sides in a religious matter," nor an "official position on religious doctrine." The Board expressed its secular view in a non-binding resolution on a matter of public policy.

Nor does the Resolution attempt to influence Church policy in a way that creates excessive entanglement. To be sure, the Establishment Clause prohibits government from intervening

---

[14]As explained in *Commack*, "kashrut" is "the Hebrew noun from which the term 'kosher' is derived," and "encompasses the entire body of rules relating to foods that may be consumed as well as to the preparation of those foods" under this "centuries-old Jewish law." *Commack*, 294 F.3d at 418.

in a religious dispute. The federal courts "are not arbiters of scriptural interpretation." *Thomas v. Review Bd.*, 450 U.S. 707, 716 (1981). But the Board has not crossed that line with its non-binding resolution; the resolution enacts no policy or regulation—it is simply a statement of the Board's position on same-sex adoption.[15]

## IV.

"[I]t is inevitable that the secular interests of government and the religious interests of various sects and their adherents will frequently intersect, conflict, and combine." *Wallace v. Jaffree*, 472 U.S. 38, 69 (1985) (O'Connor, J., concurring in judgment). Invalidating government action where this incidental overlap is present would create "chaos," *id.* at 70, and cripple the government's ability to take "action that affect[s] [all] potentially religious issues, including abortion, alcohol use, [and] other sexual issues." *American Family Ass'n*, 277 F.3d at 1123. The rights of same-sex families are no different.

[17] Properly contextualized, the Resolution does not have the purpose or primary effect of expressing hostility towards Catholic religious beliefs, and it does not foster excessive government entanglement with the Catholic Church. Accordingly, the judgment of the district court is **AFFIRMED**.

---

[15]The complaint also alleged that the Board "threatened to withhold funding from Catholic Charities of the Archdiocese of San Francisco if they do not violate Church teaching and oppose Church authority." The district court did not address this allegation in its *Lemon* analysis. Catholic League's cursory reference to this allegation in its brief is not an argument as to why this allegation supports an Establishment Clause violation; therefore we consider this allegation abandoned as a basis for Catholic League's Establishment Clause claim.

BERZON, Circuit Judge, concurring:

I concur in the majority's opinion, as it carefully and faithfully applies contemporary Establishment Clause jurisprudence to an unusual circumstance, the disapproval rather than approval of religion, embodied in a single Board of Supervisors resolution linked to no affirmative governmental regulation nor displayed in any continuing fashion in any public location.

In particular, this case is largely controlled by *American Family Association v. City and County of San Francisco*, 277 F.3d 1114 (9th Cir. 2002), which also involved San Francisco Board of Supervisors resolutions supporting equality for gays by calling upon persons with religious views to the contrary — in that instance, calling on the "Religious Right," to cease denouncing and opposing tolerance toward gays and lesbians. Similarly to the Resolution here at issue, the ones in *American Family* denounced religion-based anti-gay views as " 'erroneous and full of lies,' " and denounced anti-gay advertisements by "the Religious Right" as " 'creat[ing] an atmosphere which validates oppression of gays and lesbians,' " and encouraging mistreatment of and violence toward them. *Id.* at 1119-20. The *American Family* majority recognized that "the documents contain statements from which it may be inferred that the [supervisors] are hostile towards the religious view that homosexuality is sinful or immoral," *id.* at 1122, but concluded that, as a whole, the primary effect of the documents was "encouraging equal rights for gays and discouraging hate crimes," *id.* at 1122-23, and that, as here, "[t]he excessive entanglement prong does not easily fit the current case." *Id.* at 1123.

The only possible basis for a different outcome in this case than in *American Family* is that Establishment Clause law has been slightly refined since *American Family*, and now requires, for the purpose prong of the analysis, that the governmental action not have a predominantly religious purpose,

rather than that the governmental action be "motivated *wholly* by an impermissible purpose." *Id.* at 1121. *See McCreary County v. ACLU*, 545 U.S. 844, 862-63 (2005). But the secular purpose here is considerably more evident than in *American Family*, as the Resolution was directed not simply at expression of opinion but at urging a particular, secular result — that Catholic Charities place adoptive children with same-sex couples. That purpose is plainly the predominant one, although the Resolution does criticize a Vatican document disapproving adoptions by same-sex couples. I therefore see no basis for distinguishing *American Family* on the basis of *McCreary*, as any difference in the strength of the secular purpose cuts in favor of a stronger secular purpose here, sufficient to meet the *McCreary* standard.

All of that said, I do find the result troublesome, and find much to agree with in Judge Noonan's eloquent dissent in *American Family*. *See American Family*, 277 F.3d at 1126-28 (Noonan, J., dissenting). In particular, I am acutely aware that "the Constitution assures religious believers that units of government will not take positions that amount to the establishment of a policy condemning their religious belief," *id*. at 1126, and that resolutions such as the ones in *American Family* and the one in this case are near — if not at — the line that separates establishment of such a policy.

For that reason, I think it critical that the result in *American Family* and in this case be understood as limited by three considerations — first, that no regulation at all was attached to the resolutions — they were purely speech, albeit governmental speech; second, that the speech was broadcast to the public, as far as appears in the opinions, only by the enactment of the resolution itself, and not in any other, more intrusive and permanent way — for example, through plaques in public places, or advertisements in newspapers or on radio; and third, that the resolutions were not repeated or pervasive, but discrete. If any of these circumstances were different, I would think that the notion that there was an establishment of reli-

gion rather than the predominant pursuit of a secular purpose with a predominantly secular effect would have considerably more force, and the result might be otherwise. So, for example, a pervasive public campaign by a city to condemn Jews for not shopping on Saturday or Muslims from observing Ramadan because of the effect on the economy would probably trigger Establishment Clause concerns not here present. We need not address such matters here, however, as the Resolution, as far as the record shows, was passed but then left dormant, and so did not pervade public perception of Catholicism or Catholics as would a public advertisement campaign.

With those caveats, I concur in the opinion.